JAMES FEE

v.

MARY A. SHARKEY and MALACHI SHARKEY, her husband.

[Filed March 24th, 1900.]

1. The statute of frauds must be pleaded to be relied upon as a defence.

2. Where one takes possession of land and makes improvements thereon under a contract evidenced only by a receipt for the purchase price, there is a part performance sufficient to take the contract out of the statute of frauds.

3. A father agreed, orally, to convey a certain tract of land to his son, in discharge of an indebtedness which the son held against the father, and procured to be prepared and executed a deed to the son therefor. When the parties met to complete the transaction the son discovered that the deed did not cover the whole of the property contracted to be conveyed, whereupon the father exacted from the son $25 additional and gave him a receipt therefor, which included a promise to convey the additional land, without, however, describing it. The son accepted the deed, released his pecuniary claim against his father and took possession under the contract, and the true description of the land covered by the receipt was shown to the satisfaction of the court.—*Held*, that the case was not within the statute of frauds because the defective written contract to convey was part and parcel of the transaction, whereby the son gave a receipt for his debt, in consideration of the conveyance of the whole tract, and could not, if he was not permitted to retain title to the portion of the land covered by the receipt, be restored to his original position.

4. Where a married woman buys land with notice of a contract to convey to another, she may be compelled to make a conveyance.

5. It is not essential to the validity of a deed made by a married woman, in pursuance of a decree of a court of equity, that she should make the statutory acknowledgment necessary to convey property in her own right or to bar the dower in her husband's land.

6. The piece of land in question here was probably worth intrinsically less than $50, but was so situate with regard to the complainant's other property as to render it peculiarly valuable to him.—*Held*, not beneath the dignity of the court.

Heard on bill, answer and proofs.

*Mr. Newton S. Kitchell*, for the complainant.

*Mr. Joshua S. Salmon*, for the defendants.

PITNEY, V. C.

This is a suit for the specific performance of a contract to convey land and incidentally for an injunction to restrain an action of trespass brought in a court of law against the complainant by the holder of the legal title. The quantity of land is a fraction of an acre and its intrinsic value insignificant—probably it is less than $50—and but for its incidental value to the complainant would be beneath the dignity of the court. That point, however, was not taken at the hearing, nor was any express proof made of its value.

The making of the contract is proven beyond all doubt and is not disputed by the defendants. It was made on the 20th of August, 1879, between the complainant and his father, Daniel Fee, who was then the owner of the land in question and who subsequently conveyed it to his daughter, the defendant Mary Sharkey. She took title with full notice of the complainant's claim and the particulars thereof.

The defence is that in something less than seven years after the making of the contract it was rescinded by mutual consent and contract between the complainant and his father, and the purchase price—$25—repaid to the complainant.

On the question of rescission and repayment of the purchase price the evidence is quite contradictory and hardly reconcilable. Daniel Fee appears to have owned two small farms near each other in the township of Hanover, in the county of Morris, one where he lived and died, and the other, called the Lockwood farm, of about ten or twelve acres, included the little piece here in question. He had three children—the complainant, James, and two daughters, Mary and Ann. The daughters were both afflicted with deafness, due to an attack of scarlet fever when infants. James worked for his father for several years after he became of age and up to about the time of his marriage, and claimed that his father was largely indebted to him for his services. The claim appears to have been adjusted between them at $1,000; and for the purpose of paying that debt James swears, and in that he is uncontradicted, that his father agreed to convey him ten acres of the Lockwood place, for which James

was to pay him $100 in cash and receipt his claim for $1,000, making in all $1,100 for the ten acres. The father had the land surveyed and a deed prepared, and left the deed with a Mr. Allen, a justice of the peace in the neighborhood, to be delivered to James upon a settlement of the consideration money by a formal receipt for his claim and the payment of $100. The deed was executed on the 20th of August, 1879, and on the same day, in the morning, James called at Mr. Allen's and upon examining the deed found it only covered eight and a half acres of land (on which, however, was a house with outbuildings, where James was at that time living with his wife), and did not include the little piece of land here in controversy, which was very convenient if not absolutely necessary in order to enable James to drain the cellar of his dwelling. The land is low and flat, and the cellar of the house appears to be liable to fill with water, and the evidence of the surveyors and the levels show that the most convenient and proper mode to drain the cellar is from the east corner toward the piece of land here in dispute. A covered drain was laid and used from that corner to it. Another drain laid from another corner to the highway can be rendered available only by keeping open a deep cutting in the side drain of the road, which is apt to become obstructed. After seeing the deed James went to his father's house and told him that he would not accept it and allow him $1,100 for it, without more land. They proceeded together to Mr. Allen's and talked the matter over in his presence, and with him went to the land. Mr. Allen, an intelligent gentleman, states that they finally agreed that the old gentleman should convey to James the piece of land in question, which is somewhat triangular in shape, facing on the road, bounded on the northwest by the tract described in the deed to James, on the southeast by the road and on the north and northeast by an old fence which ran along the edge of the high ground and next to a swamp, of which nearly the whole lot in controversy is composed. This left the boundary of the piece not open to dispute. The old gentleman, however, reserved a right to water his cattle in a little run of water near the road, and inside of the line of the fence, which was agreed to by James. For

Fee v. Sharkey.

this piece of land James was to pay his father the additional sum of $25, and accept the deed for the eight and a half acres, and receipt his bill and pay the $100 ; and Mr. Allen then and there drew a receipt in these words :

"ROCKAWAY NECK, N. J., Aug. 20th, 1879.

"Received from James Fee twenty-five dollars, said money to pay for a certain portion of land in addition to that named in the deed to James Fee this day delivered.

his<br>
"DANIEL ✕ FEE.<br>
mark.

"A. L. ALLEN, witness to the mark."

The money was actually paid by James and received by Daniel Fee.

James took possession and built a barn upon the swamp piece, and occupied it until some time in the year 1893, when he moved the barn off, but still continued to occupy the premises until after his father died, whose decease occurred in 1895 or 1896.

In 1897 Mrs. Sharkey, having obtained from her father in his lifetime a deed for this and other premises, the remainder of the Lockwood lot, entered and built a fence on the line of the original deed from Daniel to James Fee, which James tore up and thereby provoked the action of trespass.

On the 20th of August, 1879, the date of the deed to James and of the receipt, James also gave his father a receipt in full for his claim of $1,000, which receipt was produced by the defendants, and reads as follows :

"ROCKAWAY NECK, N. J., Aug. 20th, 1879.

"Received from Daniel Fee a deed for a certain tract of land known as the Lockwood tract, situated at Rockaway Neck, in the township of Hanover, county of Morris, and State of New Jersey, said deed being in full for a claim of one thousand dollars acknowledged by the said Daniel Fee to me to be owing, and on receipt of certain goods named in a certain bond bearing date July 24th, 1879, shall be in full of all demand against the said Daniel Fee to date.

"JAMES FEE.

"Signed in presence of A. L. ALLEN."

This shows that James' story as to the consideration for the deed is true.

It will be observed that the receipt for $25 is not in itself a perfect contract for the conveyance of land which could be enforced by its own strength in this court against a plea of the statute of frauds, for the reason that it does not describe the land. But that defect is not fatal to the complainant's case, for several reasons. In the first place, the consideration is something besides money; it was the acceptance of the eight and a half acres, instead of ten acres, for the $1,100 consideration expressed in the deed. The transaction was a single one, and the consideration was one, so that the complainant cannot be restored to his former situation by the mere repayment of the sum of $25. In the second place, he took possession under the contract and made improvements upon the disputed premises, and, although he has since removed the stable, I think that that does not affect his equity. In the third place, the statute of frauds is not set up in defence or relied upon by the defendants.

The case thus made is a perfect one for the complainant, and the burden is cast upon the defendants of proving their defence that the contract was rescinded and the right to the premises abandoned by James. This they have undertaken to do by the evidence of his sisters, Mrs. Sharkey and Mrs. Riley. They both swear that there was continual quarreling between James and his father and the two sisters; that James was ugly and abusive; that he, on several occasions, after the making of the contract, complained that his father had charged him too much for the premises; that he had not conveyed as much land as he promised to do and that he ought to pay him back the $25, and that on one occasion—some time in the year 1886, before the marriage of the daughter Ann, which occurred in 1886—James came to the father's house and was quarreling and disputing and abusing, and that they and their mother, who was then alive, urged Daniel Fee to give James back the $25 and let him give up the land here in controversy; that his father went to his desk and got $25; handed it to James; that James accepted it; that his father demanded the receipt and that James said

he hadn't it with him but would bring it and surrender it; and that it was agreed that James should immediately remove his stable from the premises and give up possession of the land.

No fence at this time existed between the lot comprised in the conveyance and the piece intended to be covered by the receipt, nor was there ever any fence built there in the lifetime of the father, nor, as we have seen, did James remove his barn, as he is said to have promised to do, or ever give up the receipt, and it was produced at the trial by him. Mrs. Sharkey and Mrs. Riley swear that the father frequently asked him for it, but that James declared that he had burned it.

All this James denies in the most positive manner; says that he did have disputes with his father about money matters after the 20th of August, 1879, the date of the deed and receipt; that he did further work for his father and that his father promised to pay him for it and did not do so, and that he disagreed with his father both in politics and religion, and finding it difficult to get along with him and his sisters, he finally ceased all intercourse with them.

Now, if the case stopped here the question of fact would be quite difficult of solution, for the manner of James on the stand was of the best. He told his story in a straightforward, frank manner, such as impressed me with its truthfulness and reliability. Then we have the fact that he did not abandon the possession of the lot, did not give up the receipt, did not move the stable until shortly before his father died, and then because, as he swears (and in that he is not contradicted), the ground was so low and wet that it affected the health of his horses, and that he lost several of them by death during the time they occupied it. Then we have to consider that the father and son were not on good terms, but that a bitter feeling existed between them—so the daughters swear—and that it was highly improbable that the father would consent to pay back the $25 to James on a verbal promise that the contract should be rescinded without having the receipt actually delivered up and canceled at the time the money was paid. It was quite easy to wait before paying the money until James could bring the receipt from his

Fee *v.* Sharkey.

house and deliver it up. The manner of his sisters on the stand was also good, and it is almost impossible to believe that they would manufacture such a story as they told. But what they swear to is principally what they heard, and they are both extremely deaf—might easily have misunderstood what passed between their father and James. And it is true that James' father did pay him moneys on several occasions for work and labor done by him after the transaction here in question.

But there is the evidence of another witness which seems to me to turn the balance in favor of James, and that is an old gentleman named Travers. He was somewhat peculiar in his manner, and uncontrollable as a witness, but certainly honest and intelligent. I could see nothing in his manner to cast the least suspicion upon his perfect honesty and truthfulness. He was decidedly unfriendly to James, and came only under the pressure of a subpœna. He was a peddler by profession, and when following it in that neighborhood made a sort of head-quarters at Daniel Fee's house. In this respect his evidence is uncontradicted. He was on intimate terms with the family. He also worked for Daniel Fee at times in haying and harvest. The difficulties between Daniel and his son were often a matter of conversation between Mr. Travers and the old gentleman, and in the family in his presence, and his visits there continued up to the time of the death of Mrs. Daniel Fee, in 1892. He swears that never on any occasion did he ever hear it said or mentioned in the family that the bargain for the sale of the lot here in question had been rescinded, the money repaid and the land given up by James. On the contrary, old Mr. Fee frequently pointed out to him the piece here in question as what he had sold to James, told him about the right which he claimed to water his cattle, and spoke of the fact, which I should have previously stated, that a stake or stakes were driven near the road and near the ditch or water-run to show where he was to have access to the water for his cattle.

It will be remembered that it was some time early in 1886 that the daughters swear that this rescission and repayment took place. They both swear that it was before the marriage of Mrs.

Fee *v.* Sharkey.

Riley, which occurred in 1886. Now, Mr. Travers swears that in the fall of 1887—the date being fixed by the actual production of the record of a deed—he purchased through Mr. Salmon, counsel for the defendants, a piece of land in Boonton; that he walked to Boonton, from Mr. Daniel Fee's house, to pay the money and get his deed, and that Mr. Fee walked with him, and that on that occasion they passed this little piece of land, and that Mr. Fee then again pointed out the lot that he had promised to convey to his son James, and spoke of it as being James' lot; and on that and several other occasions Mr. Travers swears that he urged Mr. Fee to make a deed of it to James and satisfy him. Mr. Travers learned that James was frequently asking his father to make a conveyance, and this James himself swears to, and they both testify that the old gentleman made as an excuse for not conveying the piece that he only got $25 for it, and that it would cost at least $10 or $12 to have it surveyed and a conveyance made, and that it was not worth while to spend so much money on it. James, in this connection, also swears that his father told him that he meant to convey him the whole of the remainder of the Lockwood lot, some three or four acres, and that it was not worth while to make a conveyance of the smaller lot by itself.

This evidence of Mr. Travers is quite significant, and taking it altogether it is quite impossible to suppose that old Mr. Fee would have talked with him as he swears he did if the contract had been rescinded, the money returned and James had promised to remove his stable. Mr. Travers further swears that on several occasions after the trip to Boonton, between that time and the time of the death of Mrs. Fee, which occurred in 1892, the old gentleman still spoke of the matter in the same way, that he was under obligation to make a deed to James, but did not want to incur the expense. In fact, the whole evidence of Mr. Travers, his conversations with the old gentleman and the other members of the family, tends very strongly to show that there must be some mistake in the evidence of the two sisters.

I therefore come to the conclusion that the defendants have not made out their defence of a rescission of the contract, and

that it remains in full force and must be performed, and will advise a decree accordingly.

It was suggested, but not argued, that a married woman could not be compelled to make a conveyance. I said it was not argued. I think it is not arguable. The cases which seem to sustain that proposition are either where the husband had contracted to convey and it was held that the wife could not be compelled to join in the conveyance, or were cases where a married woman had herself contracted to convey. But here Mrs. Sharkey took the land from her father, with notice of the claim of her brother, and subject to his equity, and she cannot, by buying land under these circumstances, destroy the equity outstanding against it and shelter herself behind her coverture to defeat the right of the other party. It is not essential to the validity of a deed made by a married woman in pursuance of a decree of this court that she should make the statutory acknowledgment necessary to convey property in her own right, or to bar the dower in her husband's land. In fact, it is not necessary that she should make any conveyance at all, for the decree for conveyance executes itself under the statute. The strength of the complainant's title does not rest in any deed of conveyance executed by his sister, but in the declaration and decree of this court establishing his right in equity.

The complainant is entitled to costs.